### In re HECHINGER INVESTMENT COMPANY OF DELAWARE, INC., et al., Debtors.

### No. 99–2261 (PJW).

United States Bankruptcy Court, D. Delaware.

Oct. 10, 2000.

Mark D. Collins, Richards, Layton & Finger, P.A., Wilmington, Marc Abrams, Willkie, Farr & Gallagher, New York City, for Debtors and Debtors in Possession.

J. Joseph Curran, Jr., Attorney General of Maryland, Julia M. Andrew, Assistant Attorney General, Baltimore, MD, for the State of Maryland.

Bernadette F. Lamson, Associate County Attorney, Rockville, MD, for Montgomery County, Maryland.

Sean D. Wallace, County Attorney, J. Michael Dougherty, Associate County Attorney, Upper Marlboro, MD, for Prince George's County, Maryland.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court is the request by Hechinger Investment Co. of Delaware, Inc., et al. ("Debtors") for a declaration that certain real property transfers are exempt from state transfer and recording taxes pursuant to § 1146(c) of the Bankruptcy Code.[1] (Doc. #993; Doc. #1118). The State of Maryland objects on three grounds: first, that the proceeding is barred by the Eleventh Amendment; second, that the proceeding is barred by the Tax Injunction Act, 28 U.S.C. § 1341; and third, that § 1146(c) by its terms does not apply to pre-confirmation transfers. (Doc. #1267; Doc. #1268). Montgomery County, Baltimore County and Prince George's County, all of Maryland, join the State in its second and third objections. (Doc. #1327, Doc. #1324 and Doc. #1342 respectively)(all counties collectively, the "Counties").

For the reasons set forth below, I will overrule the objections. The proceeding does not implicate the Eleventh Amendment nor is it barred by the Tax Injunction Act. I also hold that the property sales fall within the scope of § 1146(c) and are, subject to a plan being confirmed, exempt from state transfer and recording taxes.

## Background

The relevant facts are not in dispute. The Debtors were leading retailers of home and garden care products and services. On June 11, 1999, the Debtors filed a voluntary petition for chapter 11 relief. At that time, the Debtors operated about 200 stores nationwide. They hoped to revive their business through reorganization, in part by closing underperforming locations. The Debtors, however, continued to face declining profits and liquidity problems.

On September 9, 1999, the Debtors publicly announced that they would cease operations and liquidate. On October 22, 1999, they filed a motion seeking authority under § 363 and § 365 to sell their interests in all remaining store locations. *See* Debtors' Motion for an Order (I)(A) Establishing Bid Procedures in Connection with the Sale of Certain Properties ... (II) for Orders Approving the Sale of the Properties to successful Bidders ... and (III) Granting Related Relief, (Doc. #993) at p. 5, ¶9. The motion requested a variety of related relief, including a ruling that the proposed sales were exempt from state transfer and recording taxes by reason of § 1146(c).[2] *Id.* at pp. 33–34, ¶¶61–62. The sales were necessary to reduce the Debtors' indebtedness, improve liquidity, and to facilitate the formulation and ultimate confirmation of a chapter 11 plan. *Id.* at p. 34, ¶62.

On November 9, 1999, the Debtors filed a second motion requesting Court authority to sell assets, this time a specific leasehold interest located in Montgomery County, Maryland. *See* Motion by Hechinger Property Company for an Order: (A) Authorizing the Sale And/Or Assumption and Assignment of Certain Non-residential Real Property Leases ... (B) Approving certain (i) Bid Procedures and (ii) Bidding Incentives ... and(C) Granting Related Relief (Doc. #1118). The Debtors' interest in this property was apparently subject to a number of subleases into which the Debtors had entered. *Id.* at p. 4, ¶10.

1. Unless otherwise indicated, all references to " § ___." are to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

2. § 1146(c) provides:
   The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.
   11 U.S.C. § 1146(c).

The Debtors had an offer for the entire leasehold interest, including the subleases, and therefore sought Court authority to sell the Montgomery County property as a "package deal" separate from the properties included in the prior sale motion. *Id.* at p. 7, ¶ 14. As with their previous request, the Debtors sought approval of a variety of related matters including approval of the bidding procedures, bidding incentives and break up fee, and as previously, a declaration that the transfer would be exempt from state transfer and recording taxes under § 1146(c).

The Debtors filed both motions in accordance with Federal Rule of Bankruptcy Procedure 9014.[3] Maryland, followed by the Counties, filed objections. They did not object to the sales themselves, but did object to the Debtors' request for a ruling that the sales were exempt from state and local recording taxes. I granted both sale motions but reserved judgment on the applicability of § 1146(c) pending further briefing of the issue. The parties modified the sale orders affecting properties in Maryland accordingly,[4] and agreed to a briefing schedule (Doc. # 1631).

### Discussion

*I   The Eleventh Amendment.*

Maryland first argues that the Eleventh Amendment bars this Court from exercising jurisdiction to determine that the sales are exempt from state transfer and recording taxes.

---

3.  F.R.Bank.P. 4001(a)(1) requires a party to file a § 363(e) motion in accordance with F.R.Bank.P. 9014.

4.  The order approving the Debtors' sale of assets to Klaff Realty, LP (Doc. # 1634), for example, provides: "Except with respect to the sale of the Fee Property located at 1811 Rolling Road, Baltimore, Maryland ... the sale and assumption and assignment of the Properties to Klaff is hereby deemed exempt from state and local transfer taxes pursuant to 11 U.S.C. § 1146(c) ... With respect to the Maryland Property...the issue of whether the sale of the Maryland Property to Klaff is exempt from any state or local law imposing a stamp, transfer, recordation or similar tax (collectively, the "Fees") in accordance with

■ The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI.

Although the Amendment expressly bars only suits against States by citizens of other States, the Supreme Court has long held that the Amendment also bars suits against the State by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Sacred Heart Hospital of Norristown v. Pennsylvania (In re Sacred Heart Hospital of Norristown),* 133 F.3d 237, 241 (3d Cir.1998). The Amendment divests federal courts from jurisdiction over private suits against unconsenting states. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). Nor may Congress pass a law under its Article I powers to vest federal courts with jurisdiction to hear such suits. *Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. at 1131–32; *see also Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2266, 144 L.Ed.2d 636 (1999) (holding that states likewise retain immunity from private suit in their own courts which Congress may not abrogate by Article I legislation).

---

section 1146(c) of the Bankruptcy Code (the "Fee Issue") will be considered by the Court after briefing is completed on this issue ... The parties shall submit to the Court a briefing schedule on the Fee Issue for its consideration. If any Fees should become due and owing, and any such Fees are paid prior to the Court's decision on the Fee Issue, such payment shall be under protest and subject to the payor's rights to receive from the State of Maryland and/or Baltimore County, Maryland, as the case may be, a full refund of the Fees in the event the Court determines that the sale of the Maryland Property to Klaff is exempt from the Fees." Doc. # 1634, p. 9, ¶ 15.

■ Eleventh Amendment immunity derives from the axiom that each state is a sovereign entity in our federal system, and as such, is not amendable to the suit by an individual without its consent. *Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122. The immunity exists to prevent a federal court from entering a private judgment that a state must pay from its treasury. *Seminole Tribe,* 517 U.S. at 58, 116 S.Ct. at 1124. "[I]t also serves to avoid the 'indignity of subjecting a state to the coercive process of federal judicial tribunals at the instance of private parties'". *Id.* (quoting *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993)).

■ The immunity granted by the Eleventh Amendment is not absolute. Most fundamentally, it only applies to "suits against a State." U.S. CONST. amend. XI; *see, e.g., Mitchell v. Franchise Tax Board, State of Calif. (In re Mitchell),* 209 F.3d 1111, 1116 (9th Cir. 2000); *Chandler v. Oklahoma ex rel. Oklahoma Tax Comm'n (In re Chandler),* 251 B.R. 872, 875 (10th Cir. BAP 2000). A precise definition of a "suit" as contemplated by the Eleventh Amendment is elusive. The only well-established rule is that an action by a private party against a state, which seeks entry of a monetary judgment against the state, is a suit for purposes of the Eleventh Amendment.[5] *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). The majority view in bankruptcy is that an adversary proceeding against a state is a suit under the Eleventh Amendment. *Chandler,* 251 B.R. at 875–76 (collecting cases); *but see In re Bliemeister,* 251 B.R. 383 (Bankr.D.Ariz.2000) (debtor's adversary proceeding to determine dischargeability of debt to Industrial Commission of Arizona not barred by Eleventh Amendment).

■ Maryland argues that the Eleventh Amendment applies to the present proceedings because the Debtors' motions are "suits." It reasons that the defining characteristic of an Eleventh Amendment suit is whether the action results in a loss to the State, either via a direct judgment against the state or by a declaration that will ultimately adversely affect the State's interests. Thus it urges the Court to consider the *effect* of the proceeding, not its procedural posture, when determining whether the proceeding is a suit. In the present case, Maryland argues that the effect of the motions is to preclude Maryland from collecting revenue, thus rendering the motions suits under the Eleventh Amendment. It claims that whether the Debtors seek relief in the form of a declaratory ruling or an affirmative injunction or judgment, or whether they proceed by motion rather than by adversary proceeding, is immaterial.

Maryland relies primarily on *NVR Homes, Inc. v. Clerks of the Circuit Courts Anne Arundel County (In re NVR, L.P.),* 189 F.3d 442 (4th Cir.1999), *cert. denied,* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 815 (2000), for its position. In *NVR Homes,* the reorganized debtor filed a motion the purpose of which was to obtain a declaration under § 1146(c) that it was exempt from transfer and recording taxes already paid. 189 F.3d at 448. The debtor hoped to use the ruling against Maryland and Pennsylvania to obtain a refund of the taxes. *See id.*

---

**5.** Even where the Eleventh Amendment does apply, a state may be divested of its immunity. *See In re Sacred Heart Hospital,* 133 F.3d at 242. First, Congress may abrogate state sovereign immunity if Congress expresses a clear intent to do so and it acts pursuant to a valid constitutional provision. *Id.* Second, a state may voluntarily consent to suit in federal court. *Id.* Voluntary consent may be express, e.g., by state statute or constitutional provision. Voluntary consent may also be by waiver, i.e., a state may consent to federal court jurisdiction by its affirmative conduct. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985); *Gardner v. New Jersey,* 329 U.S. 565, 573–74, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1947).

The Court of Appeals for the Fourth Circuit held that the debtor's motion was a "suit" against the states for purposes of the Eleventh Amendment. *Id.* at 454, 458. The Fourth Circuit reasoned that determining whether an action is a suit requires an evaluation of the procedure and substance of the action. *NVR Homes,* 189 F.3d at 452. Under this standard, looking at the procedure of the action requires an analysis of both the degree of coercion exercised by the federal court in compelling a state to appear, and whether the remedy or resolution of the action requires federal court jurisdiction over the state. *Id.* Analyzing the substance of the action focuses on whether the action was a prosecution of a demand against the states, or merely the orderly disposition of assets with the states' role relegated to that of a creditor. *Id.*

Under this standard, the Fourth Circuit concluded that the debtor's motion seeking a ruling against the states under § 1146(c) was a suit within the meaning of the Eleventh Amendment. *Id.* at 454. The court's holding rests on the substantive, rather than procedural, analysis of the action. It concluded that the form of the action alone, i.e., that the debtor requested relief by motion under F.R.Bank.P. 9014, did not amount to a suit because the states were not compelled to participate in the proceedings. *Id.* at 452–53. Despite the fact that the states were not coerced or made to suffer "the indignity" of being summonsed to appear in federal court, however, the Fourth Circuit concluded that the substance of the motion was a prosecution of the states by the debtor to disgorge monies from state treasuries. *NVR Homes,* 189 F.3d at 454. It concluded that such an action is a "suit" barred by the Eleventh Amendment. *Id.*

Maryland relies on this holding as the basis of its argument that the ultimate effect of a proceeding determines whether it is a suit under the Eleventh Amendment. In response the Debtors argue that the adverse effect alone of a proceeding does not transform the proceeding into a suit. If the action does not result in an affirmative *recovery* against a state, then the proceeding is not a suit against the state. The Debtors cite an earlier Fourth Circuit case which found that a motion requesting a § 1146(c) declaration was not an Eleventh Amendment suit. *See State of Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777 (4th Cir.1997).

In *Antonelli,* Maryland and two of its counties brought suit against the Antonelli Creditors' Liquidating Trust to recover state and county transfer and recordation taxes. 123 F.3d at 779. The defendants answered that the transfers were made pursuant to a confirmed bankruptcy plan which expressly incorporated § 1146(c), and that the transfers were thus exempt from taxation. *Id.* Maryland and the counties responded by claiming that they were immune from applicability of the bankruptcy court's confirmation order by reason of the Eleventh Amendment. *Id.*

The Fourth Circuit held otherwise. It concluded that the confirmation order was not entered in a suit against the state. *See Antonelli,* 123 F.3d at 786. Maryland was not named a defendant, nor was it served with process mandating appearance in federal court. *Id.* Notice of the pending confirmation hearing on its own, the court held, was not the type of coercive process contemplated by Eleventh Amendment immunity. *See id.* The State was free to enter federal court or to refrain from doing so. *Id.* The power of the bankruptcy court to enter an order confirming a plan, including a provision interpreting § 1146(c), the Fourth Circuit held, derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates. *Id.* at 787.

The Debtors argue that the proceedings before this Court fall within the scope of *Antonelli,* not *NVR Homes.* They distinguish *NVR Homes* from their own situation because the debtor in *NVR Homes* had already *paid* the relevant taxes.

Thus, according to the Debtors, *NVR Homes* is not controlling because the relief requested required a direct recovery from the state, unlike that sought by the Debtors here or that sought by the liquidating trust in *Antonelli*. Maryland disagrees. It maintains that a distinction based on whether the tax has been paid at the time the motion is filed is a distinction without a difference, and that the Debtors' case falls within the scope of *NVR Homes*.

▮▮▮▮▮ At first glance, the two opinions seem incongruous. However, the proposition established in the two cases are reconcilable. A proceeding in which a bankruptcy court can only adjudicate by invoking jurisdiction over the state is a suit against the state for purposes of the Eleventh Amendment.. A proceeding in which the bankruptcy court can determine without having to exercise jurisdiction over the state is not a suit against the state for purposes of the Eleventh Amendment. *Compare NVR Homes*, 189 F.3d at 453 ("This case is indeed one in which adjudication depends on the court's jurisdiction over the state")(internal quotations omitted), *with Antonelli*, 123 F.3d at 787 (bankruptcy court's power to determine compliance with federal law derives from jurisdiction over debtors and their estates, not from jurisdiction over state or other creditors). For this reason the procedural posture of an action often, but not always, determines whether the action is a suit for purposes of the Eleventh Amendment.

▮▮▮▮▮ A proceeding that seeks an order requesting the turnover of property already in the possession of a state is a "suit," even if the proceeding is in the form of a motion. *See NVR Homes*, 189 F.3d at 454 (the action "clearly sought a determination that the states owed [the debtor] money—repayment of exempt transfer and recordation taxes—and a favorable decision would require that a federal court raid [the states'] treasuries."). Conversely, an action which the bankruptcy court can re-solve under its jurisdiction over debtors and their estates rather than over the state itself, is not a "suit" within the meaning of the Eleventh Amendment. *See Antonelli*, 123 F.3d at 787 ("[N]either the party status nor the immunity of state and local governments has any impact on the bankruptcy court's power to determine whether the terms of a reorganization plan comply with federal law.").

The issue faced by the Fourth Circuit in *NVR Homes* was that the debtor sought direct recovery from the state's treasury via the procedural mechanism of a motion. The Fourth Circuit was faced with a wolf in sheep's clothing: like the majority of motions in a bankruptcy case, the action before the court did not look like a suit because it did not name the state as a defendant nor did it require that the state be served with process and hauled into federal court. A ruling on the motion, however, was effectively a judgment against the state and required turnover of money from the state treasury. As such, it fell within the prohibitions of the Eleventh Amendment. Hence the Fourth Circuit's emphasis on the substantive *effect* of the relief requested, rather than on its procedural posture. *See NVR Homes*, 189 F.3d at 453–54.

Maryland interprets *NVR Homes* to hold that the effect of a ruling, at any point in time, determines whether the underlying action is a suit. It would have the action rendered a suit based only on the possibility that the Debtors may have to resort to further legal proceedings, under the *Ex Parte Young*[6] doctrine for example, to enforce the ruling against the State. I believe Maryland reads the holding in *NVR Homes* too broadly. First, under such reasoning, any federal court order tangentially impacting a state's interest (e.g., one determining national citizenship, federal welfare rights, or the scope of environmental protection laws) could be argued to violate the Eleventh Amendment because its enforcement may

**6.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

require further court action. Maryland appears to interpret its constitutional immunity from private suit in federal court as a constitutional immunity from federal law.

■ Second, the basis of a State's Eleventh Amendment immunity is its sovereignty, which is only violated if the Court exercises involuntary jurisdiction over the State *qua* State. A declaratory ruling interpreting bankruptcy law as it applies to transfers of the Debtors' real property interests is based on the Court's jurisdiction over the Debtors and their estate. *See* 28 U.S.C. §§ 157, 1334. It does not depend on jurisdiction over Maryland. The State is free to participate or not as it deems fit. That the effect of the ruling precludes Maryland from collecting transfer taxes is a function of substantive federal law, not a violation of its constitutional rights. *Accord Texas v. Walker,* 142 F.3d 813, 822–23 (5th Cir.1998)(bankruptcy discharge injunction not a suit under Eleventh Amendment), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 865, 142 L.Ed.2d 768 (1999); *Antonelli,* 123 F.3d at 787; *In re Collins,* 173 F.3d 924, 930–31 (4th Cir. 1999) (motion to reopen case to determine dischargeability of debt to state not a "suit"), *cert. denied,* 528 U.S. 1079, 120 S.Ct. 785, 145 L.Ed.2d 663 (2000); *Smith v. Psychiatric Hosp. of Fla., Inc. (In re Psychiatric Hosp. of Fla., Inc.),* 216 B.R. 660, 661 (M.D.Fla.1998)(affirmed bankruptcy court decision that motion to determine debtor's tax liability under § 505 not a "suit"); *In re Sun Healthcare Group, Inc.,* 245 B.R. 779, 785 (Bankr.D.Del.2000) (debtor's post-petition financing order not suit against state under Eleventh Amendment); *Harden v. Gilbert (In re Int'l Heritage, Inc.),* 239 B.R. 306, 309–10 (Bankr. E.D.N.C.1999) (proceeding to determine scope of automatic stay in bankruptcy not Eleventh Amendment suit even if contested).

I conclude that the Debtors' request for a ruling that certain real property transfers are exempt from state transfer and recording taxes under § 1146(c) is not a suit against Maryland. The Eleventh Amendment therefore does not apply and I need not address the parties' additional arguments on the constitutionality of § 106, the applicability of the *Ex Parte Young* doctrine, or whether Maryland has voluntarily consented to federal court jurisdiction by filing an opposition to the Debtors' motion.

## II  Applicability of the Tax Injunction Act, 28 U.S.C. § 1341.

Maryland, joined by the Counties (together the "Taxing Authorities"), next argues that even if the Eleventh Amendment does not apply, the Court still lacks jurisdiction to rule on the Debtors' tax liability because the Tax Injunction Act bars such a proceeding ("Act"). *See* 28 U.S.C. § 1341.

The Tax Injunction Act provides:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341.

According to the Taxing Authorities, the Debtors' motion falls within the Act because it will afford the same relief as an injunction by preventing tax collectors from demanding payment of recording taxes. The Taxing Authorities also argue that § 505 does not provide otherwise. They claim § 505 does not permit a bankruptcy court to enjoin the collection of a tax that is not related to a claim against the debtor or its estate.

Section 505(a)(1) provides:

Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and ad-

judicated by a judicial or administrative tribunal of competent jurisdiction.[7]

11 U.S.C. § 505(a)(1).

The Debtors disagree that the Tax Injunction Act precludes the Court from determining the Debtors' eligibility for exemption from state tax under § 1146(c). They argue that to the extent necessary § 505 provides jurisdiction and excepts the bankruptcy court from the Act.

The Tax Injunction Act, first passed in 1937, was intended to prevent taxpayers from using federal courts to challenge the validity of state taxes under either state or federal law. *Osceola v. Florida Dep't of Revenue*, 893 F.2d 1231, 1232–33 (11th Cir.1990)(and cases cited therein). Its purpose is to "confin[e] federal court intervention in state government." *Jefferson County, Alabama v. Acker*, 527 U.S. 423, 433, 119 S.Ct. 2069, 2076, 144 L.Ed.2d 408 (1999), *quoting Arkansas v. Farm Credit Servs. Of Central Ark.*, 520 U.S. 821, 826–27, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997). The Act is a statutory limit on federal court jurisdiction where equitable jurisdiction might otherwise exist. *See Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 298–99, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407 (1943); *Osceola*, 893 F.2d at 1232.

Maryland argues that the Tax Injunction Act applies to these proceedings. The Debtors, however, are asking this Court for a ruling on the scope of a federal tax exemption. They are not challenging the validity of the underlying state taxes nor do they contest the adequacy of the state law remedies. The proceeding, therefore, does not fall within the prohibitions of the Act.

To the extent that a bankruptcy court must determine a debtor's tax liability in an area where such a determination may otherwise be barred by the Tax Injunction Act, the overwhelming majority view is that Congress expressly conferred jurisdiction on bankruptcy courts to do so in § 505 of the Code. Section 505(a), carves out an exception to the Tax Injunction Act and confers jurisdiction on the bankruptcy court to determine a debtor's tax liability. *See City of Perth Amboy v. Custom Distribution Serv., Inc. (In re Custom Distribution Serv., Inc.)*, 224 F.3d 235, 239–40 (3d Cir.2000)(§ 505 is jurisdictional statute that confers on Bankruptcy Court authority to determine certain tax claims); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1138 (6th Cir.1991)(same), *cert. dismissed*, 503 U.S. 978, 112 S.Ct. 1605, 118 L.Ed.2d 317 (1992). Section 505(a) specifically grants the court authority to determine the amount or legality of any tax, whether paid or previously contested. There is no requirement in § 505 that a debtor must exhaust available state law remedies as a precondition for obtaining a bankruptcy court ruling on such liability. Nor does a bankruptcy court have to defer from so doing pending a determination in state court.[8] *See In re Stoecker*, 179 F.3d 546, 549 (7th Cir.1999)(Posner, J.)("If federal courts could not determine the debtor's liability for state taxes—if they had to abstain pending a determination of that liability in state court—bankruptcy proceedings would be even more protracted than they are."), *aff'd sub nom. Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *City Vending of Muskogee, Inc. v. Oklahoma Tax Comm'n*, 898 F.2d 122, 123 (10th Cir. 1990) (Tax Injunction Act does not pre-

---

7. The exceptions in § 505(a)(2) are not at issue nor are they applicable to the facts of this case.

8. Although as stated in this Court's recent opinion in *Montgomery Ward Holding Corp., et al. v. Maria Pappas, Treasurer of Cook County,* *Illinois (In re Montgomery Ward Holding Corp., et al.)*, A–99–87; Case No. 97–1409–PJW (September 1, 2000), the Court can in appropriate circumstances exercise its discretion to abstain in deference to the state court or administrative procedures.

**316**

clude determination of state tax liability where federal courts have jurisdiction under § 505 of Bankruptcy Code), *cert. denied*, 498 U.S. 823, 111 S.Ct. 75, 112 L.Ed.2d 48 (1990).

The Debtors' request for a determination of the exemption available under § 1146(c) concerns the Debtors' assets and falls within the language of § 505(a) ("...the court may determine the amount or legality of any tax ... whether or not previously assessed..."). It is not a request to determine the tax liability of individuals or entities other than the debtor. Therefore the cases cited by the Taxing Authorities which limit a bankruptcy court's ability to determine the tax liability of a non-debtor entity under § 505 are inapposite.

Furthermore, the plain wording of the Tax Injunction Act makes it inapplicable to § 1146(c). The Tax Injunction Act states that federal courts "should not enjoin, suspend or restrain the assessment, levy and collection of any tax under State law *where* a plain, speedy and efficient remedy may be had in the courts of such States." 28 U.S.C. § 1341. (Emphasis added.) A State court cannot have a "plain, speedy and efficient remedy" as to the existence of the tax exemption under § 1146(c) because the bankruptcy court has original and exclusive jurisdiction over "all cases under title 11", 28 U.S.C. § 1334(a), and § 1146(c) has application only in a case under title 11.

Accordingly, I find that the Court's jurisdiction under § 505(a) is not limited by the Tax Injunction Act and that likewise the equally clear federal mandate of § 1146(c) is not limited by the Tax Injunction Act.

*III   The Debtors' Transfers as Exempt under § 1146(c).*

The Taxing Authorities' final argument is that § 1146(c) by its terms does not apply to a transfer that occurs prior to confirmation of a plan. Section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." The statute makes clear that transfers by Chapter 7, 9, 12 and 13 debtors do not qualify for the exemption.

■   This provision exempts plan transfers from state stamp tax or similar taxes. For a deed or instrument of transfer to qualify, it must meet three criteria: (1) the tax must be a stamp or similar tax, (2) imposed upon the making or delivery of an instrument transferring an interest in property, and (3) made "under a plan confirmed." *See, e.g., City of New York v. The Baldwin League of Independent Schools (In re The Baldwin League of Independent Schools)*, 110 B.R. 125, 126 (S.D.N.Y.1990); *In re Amsterdam Ave. Dev. Assoc.*, 103 B.R. 454, 456 (Bankr. S.D.N.Y.1989).

■   At issue here is the third criteria. The Taxing Authorities argue that "under a plan confirmed" requires that the sale occur after a chapter 11 plan is confirmed. According to the Taxing Authorities, who again rely on *NVR Homes*, Congress intended to limit the tax exemption to only those transfers which facilitate the implementation of a confirmed plan by exempting those transfers necessary to make the plan effective.

The Debtors maintain that the language of § 1146(c) does not create a necessary relationship between plan confirmation and the timing of the transfer. "[U]nder a plan confirmed" requires only that the transfer occur subject to a plan that is ultimately confirmed, i.e., the fact of plan confirmation rather than its timing is the critical issue.

The Debtors cite *City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.)*, 758 F.2d 840 (2d Cir.1985) and its progeny for the rule that where a transfer, and hence an instrument of transfer, is

necessary or essential to the consummation of a plan, the transfer is "under a plan" within the meaning of § 1146(c). The Debtors maintain this interpretation is consistent with legislative history and Congress' intent in providing the exemption, which is to aid debtors in chapter 11 by preserving funds to debtors' estates from the sale of assets necessary to fund a plan.

There is a split of authority whether "under a plan confirmed" limits § 1146(c) to post-confirmation transfers. I find the text to be ambiguous because it can reasonably support two different outcomes. From one perspective, "under a plan confirmed" requires plan confirmation as a precondition to eligibility for the exemption. *See NVR Homes*, 189 F.3d at 456–57. Alternatively, it can be read as merely describing a type of eligible transfer, i.e., one that is an integral part of the plan process for a plan later confirmed or pursuant to a confirmed plan, as opposed to, for example, a transfer incidental to a debtor's business operations. *See, e.g., City of New York v. Smoss Enter. Corp. (In re Smoss Enter. Corp.)*, 54 B.R. 950, 951 (E.D.N.Y.1985) (holding pre-confirmation transfer essential to fund plan is exempt under § 1146(c)); *In re Lopez Dev., Inc.*, 154 B.R. 607, 609 n. 3 (Bankr.S.D.Fla.1993) (that transfer occurred prior to plan confirmation irrelevant under § 1146(c)); *In re Permar Provisions, Inc.*, 79 B.R. 530, 533–34 (Bankr.E.D.N.Y.1987)(same).

I believe the latter reading comports best with the purpose of § 1146(c). Congress apparently enacted § 1146(c) to encourage chapter 11 plans by providing chapter 11 debtors with tax relief when they are compelled by business realities to sell certain assets. *See In re Permar*, 79 B.R. at 533 (discussing legislative history). This reduces the obligations encumbering the debtor's property and produces enhanced value for plan distributions. Reading § 1146(c) to require only that a plan be ultimately confirmed implements this goal and is consistent with the realities of chapter 11 proceedings.

The transfer of assets, including real estate, is usually an essential part of the plan process. A debtor will often sell assets during the course of its case to maximize proceeds in anticipation of the plan it intends to propose. Confirmation is the final major step in a debtor's bankruptcy and more often than not occurs after the debtor, in consultation and negotiations with parties in interest, has developed a business plan for emergence from chapter 11. In most cases, a debtor will sell assets throughout the pre-confirmation period because the retention of those assets is incompatible with the business plan for emergence from chapter 11. I find that excising pre-confirmation transfers from the scope of § 1146(c) undermines the purpose of the provision, i.e., maximizing the proceeds from the sale of unneeded assets as a part of implementing and/or funding a plan.

The Taxing Authorities' view of § 1146(c) is that it should only benefit a reorganizing, not a liquidating, debtor. This, of course, is the view expressed by the Fourth Circuit in *NVR Homes*, 189 F.3d at 456 ("we ... conclude that transfers taking place prior to the date of a *reorganization plan's* confirmation are not covered by § 1146(c).") (Emphasis added). However, § 1146(c) merely requires that a *plan* be confirmed under § 1129. It does not require a reorganization plan. Indeed, nowhere in the relevant provisions of Chapter 11 can one find the terms "reorganization plan" or "plan of reorganization." And the Bankruptcy Code sets forth specific provisions for liquidating Chapter 11 plans. *See, e.g.,* § 1129(a)(11) (court shall confirm plan if doing so is "not likely to be followed by the liquidation ... of the debtor ... unless such liquidation or reorganization is proposed in the plan"); § 1123(a)(5) (plan must provide adequate means for its implementation including the "sale of all or any part of the property of the estate..."); § 1123(b)(4) (plan may "provide for the sale of all or substantially all of the property of the estate, and the

distribution of the proceeds of such among holders of claims or interests"); § 1141(d)(3)(A)(chapter 11 plan confirmation does not discharge debtor if "plan provides for the liquidation of all or substantially all of the property of the estate"); *In re WHET, Inc.*, 12 B.R. 743, 750–51 (Bankr.D.Mass.1981) (trustee may first liquidate assets and then propose plan for distributing proceeds to creditors); *In re WFDR, Inc.*, 10 B.R. 109, 110 (Bankr. N.D.Ga.1981) ("[T]here is no prohibition against a liquidating Chapter 11 reorganization."); *see also Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 197–98 (9th Cir.1977) (reviewing cases under Bankruptcy Act and finding a plan that provides for orderly liquidating is a proper plan of "reorganization").

The Taxing Authorities rely on *NVR Homes*. The facts of that case, however, are distinguishable. The debtor in *NVR Homes* was a leading homebuilder. It made 5,571 transfers of real property on which it paid just over $ 8.3 million in transfer and recording taxes during the approximately eighteen months in which it was in chapter 11. *See NVR Homes*, 189 F.3d at 447–48. The debtor's confirmed plan incorporated § 1146(c). *Id.* at 448. After the debtor emerged from bankruptcy, it began pursuing refunds of the recordation and transfer taxes paid during the bankruptcy period, including those paid prior to confirmation of its plan. *Id.*

This chronicle is appreciably different from that of the Debtors, and invokes distinct concerns not relevant here. The Debtors are commercial retailers not in the business of selling real estate. They are trying to sell assets to fund a liquidating chapter 11 plan. In contrast, the debtor in *NVR Homes* attempted to use the relief of § 1146(c) to avoid taxes it routinely incurred as a cost of doing the type of business in which it was engaged, i.e., homebuilding.

Although the outcome of *NVR Homes* may be correct, the Court's basis for reaching that result is not convincing to me. The Fourth Circuit rejected the cases which followed *Jacoby–Bender* because, it concluded, those cases misinterpreted the relevant legal standard. *See NVR Homes*, 189 F.3d at 455–56. According to the Fourth Circuit, courts following *Jacoby–Bender* changed its holding from "transfers necessary to the consummation of a plan" to "transfers necessary to the confirmation of a plan." *Id.* at 456. The difference between a transfer in consummation of a plan, which the Fourth Circuit interprets as execution of a plan, and a transfer in confirmation of a plan is the timing of the events within the bankruptcy process. The Fourth Circuit found this a critical, and impermissible, change because consummation of a plan cannot take place until the bankruptcy court first confirms the plan. *Id.*

The *NVR Homes* court found no other basis in § 1146(c) for the proposition that a transfer essential to plan confirmation is "under a plan confirmed." *See id.* at 457. It turned to the dictionary for a definition of "under" and concluded that a transfer made prior to the date of plan confirmation cannot be under, i.e., subordinate to or authorized by, something that did not exist at the date of transfer, i.e., a plan confirmed by the court. *See NVR Homes*, 189 F.3d at 457. The Fourth Circuit therefore concluded that Congress intended to provide exemptions only to those transfers reviewed and confirmed by the court. *Id.* at 458.

I find this reasoning unpersuasive for several reasons. As noted above, § 1146(c) is not clear on its face. I also find it unlikely that Congress carefully and precisely used the phrase "under a plan confirmed" to segregate out all transfers that occur prior to plan confirmation regardless of their necessity or appropriateness for such confirmation. When Congress wants to impose a temporal condition on a bankruptcy transaction, it does so expressly. *See, e.g.*, § 1104(a) ("At any time after the commencement of the case but before confirmation of a plan...");

§ 1105 ("At any time before confirmation of a plan..."); § 1121(b) ("...only the debtor may file a plan until after 120 days after the date of the order for relief").

I find persuasive an additional reason why "under a plan confirmed" should be construed to describe eligible transfers rather than to impose a temporal restriction on the transaction itself. As a description, "under a plan confirmed" embodies an intent to exclude ordinary course of business and non-debtor transactions from the scope of § 1146(c). These meanings lie within the definition of "under" and are necessary to apply the provision. If Congress intended to encourage plan confirmation, it follows that Congress would facilitate the process by providing tax relief for only those transfers necessary for the plan, rather than those transfers which a debtor would transact anyway as a function of its day to day operations. Under this reading of § 1146(c), it is unlikely that the debtor's transfers in *NVR Homes* would have been eligible for § 1146(c) relief.

More significantly, however, limiting eligible transfers to those "under a plan confirmed" limits such transfers to those over which the bankruptcy court has jurisdiction, i.e., those which concern the debtor and property of the debtor's estate. Several courts, including the Fourth Circuit, have relied on this meaning of "under a plan confirmed" to exclude transfers between third parties over which the bankruptcy court may otherwise lack jurisdiction. *See, e.g., Mensh v. Eastern Stainless Corp. (In Case of Eastmet Corp.)*, 907 F.2d 1487, 1489 (4th Cir.1990) (holding that while non-debtor purchase money deed of trust can be described as "part of the same transaction" by which the buyer acquired debtor's real property, that does not elevate the deed of trust to status of something "under a plan confirmed"); *In re Kerner Printing Co., Inc.*, 188 B.R. 121, 124–25 (Bankr.S.D.N.Y.1995) (holding that transfers between non-debtor third parties not subject to § 1146(c) exemption even if

transfer necessary to finance acquisition of debtor's property); *cf., The Baldwin League of Independent Schools,* 110 B.R. at 127–28 (pre-confirmation mortgage which debtor obtained to fund plan exempt under § 1146(c) where debtor was the borrower).

Thus "under a plan confirmed" connotes a transfer to which the debtor or its assets are a party and over which the bankruptcy court has jurisdiction. A transfer between a debtor and a second party is readily classified as coming "under a plan," whereas a transfer between two non-debtors is not. Similarly, "under a plan confirmed" connotes those transfers essential to a plan and excludes those unrelated transfers that occur incidentally to a debtor's ordinary course transactions.

The Fourth Circuit's reasoning, however, reads these alternate meanings out of § 1146(c). Its holding that "under" modifies "a plan confirmed" to include only post-confirmation transfers leads to the conclusion that any post confirmation transfer qualifies for exemption. *See NVR Homes,* 189 F.3d at 456 ("...we think it irrelevant under § 1146(c) whether the transfers took place in the ordinary course of business."). Thus under the Fourth Circuit's reasoning, "under a plan confirmed" imposes a strict timing requirement on the transfer, but nothing more.

To illustrate the effect on the Chapter 11 plan process vis-a-vis the *NVR Homes* narrow view of the applicability of § 1146(c), I note the following basic scenarios that different Chapter 11 cases bring to bear:

(1) One approach is to effect a transfer of all of the debtor's properties by way of a going concern sale of the debtor's business as authorized by a confirmed plan. This would constitute a liquidating plan.

(2) Another approach is a transfer of some portions of the debtor's business/property as authorized by a confirmed plan. This would be pursuant to the debtor's restructuring or downsizing of

its operations with a refocused reorganized debtor emerging.

(3) As an alternative to scenario (1) above, a debtor may transfer all, or substantially all, of its property by way of a going concern sale of the business prior to the filing of, or confirmation of, a plan. This typically occurs because the debtor has no reasonable prospects for reorganization, is in a severe negative cash flow situation and cannot await the plan confirmation process if the estate is to realize going concern value in the disposition of the business. This would result in a liquidating plan.

(4) There can be a transfer of property as a part of a sale of one or more divisions of the debtor's business, done as a part of a formulated business plan to emerge from Chapter 11 with the transfer taking place prior to the filing of, or confirmation of, a plan. The pre-plan disposition may be prompted by the need to obtain going concern value for underperforming parts of the business and/or the need to position the debtor in its new business mode in order to formulate and negotiate a plan of reorganization.

(5) In a case that may run for a year or two, periodic and numerous dispositions of properties occur leading up to the development of a business plan and the negotiation and filing of a reorganization plan, leading to the emergence of a refocused business enterprise.

There are, of course, variations of these basic scenarios, but the point is that in my experience a very distinct minority of cases fall into scenarios (1) and (2). To accept the narrow reading of § 1146(c) put forth by *NVR Homes* would limit the relief Congress mandated by § 1146(c) to scenarios (1) and (2) (assuming scenario (1), a liquidating plan, would qualify under the *NVR Homes* test). I find it difficult to believe that Congress intended such a limited application of the exemption, particularly given the absence of a rational basis for preferring some plan scenarios over others.

Given the realities of the plan process in Chapter 11, I believe that if a transfer, and thus an instrument of transfer, is essential to or an important component of the plan process, then the transfer is "under" the plan within the meaning of § 1146(c) and the exemption applies whether the transfer occurs before or after plan confirmation, provided a confirmation occurs.

■ As a matter of practice, taxing authorities can be protected in the event a Chapter 11 case is dismissed or converted to a Chapter 7 case. To address the concerns of taxing authorities, while simultaneously implementing what I view as the statutory purpose of facilitating plan confirmation, a court may order debtors to escrow from sale proceeds of pre-confirmation transfers funds sufficient to pay the subject tax if no plan is confirmed. Thus, if a debtor is unable to confirm a plan under chapter 11, taxing authorities would be able to obtain payment of the tax due. Conversely, if a debtor obtains plan confirmation, it obtains the benefit from the tax relief provided by § 1146(c).

### Conclusion

In sum, I hold that the Debtors' motions for an order declaring the sale of certain real property exempt from state transfer and recording taxes are not suits for purposes of the Eleventh Amendment because adjudication of the motions does not require the Court to exercise jurisdiction over Maryland. I also hold that a determination under § 1146(c) does not implicate the Tax Injunction Act and to the extent necessary, § 505 confers jurisdiction on the bankruptcy court to determine a debtor's tax liability. Finally, I hold that a transfer, and thus an instrument of transfer, that is essential to or an important component of the plan process, even if it occurs prior to plan confirmation, is "under a plan" within the meaning of § 1146(c), subject to an appropriate escrow

of funds to cover the tax liability in the event a chapter 11 plan is not confirmed.